```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
                     SOUTHERN DIVISION

DR. BARBARA MICHAEL,        }
                            }
     Plaintiff,             }
                            }
                            }   CIVIL ACTION NO.
v.                          }
                            }   97-AR-1957-S
THE BOARD OF TRUSTEES OF THE}
UNIVERSITY OF ALABAMA,      }
                            }
     Defendants.            }
```

FILED
99 AUG 12 PM 3:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
AUG 12 1999

**MEMORANDUM OPINION**

This court has previously granted the motion for judgment as a matter of law filed pursuant to Rule 50(a), F.R.Civ.P., by defendants, The Board of Trustees of the University of Alabama, d/b/a University of Alabama at Birmingham ("UAB"), insofar as that motion targeted the claims of plaintiff, Dr. Barbara Michael ("Michael"), brought under Title IX and under 42 U.S.C. § 1983 and her claim of hostile environment brought under Title VII. The court took under advisement UAB's said Rule 50(a) motion as addressed to Michael's claims brought under Title VII for alleged disparate treatment in not increasing her salary appropriately for the 1992-1993 academic year and for not renewing her annual teaching contract effective 1996. In view of the jury's responses to special interrogatories, it now becomes necessary to rule upon the unruled upon aspects of UAB's Rule 50(a) motion.

1



<u>Jury Trial of Back Pay Claims?</u>

Until her non-renewal, Michael was a tenure-tracked assistant professor of anthropology at UAB. She claims to be the victim of gender discrimination. In her complaint she demanded "a trial by struck jury on all claims triable to a jury." After the 1991 amendment to the Civil Rights Act of 1964 there was no longer any argument over Michael's right to a jury trial on UAB's liability under a Title VII disparate treatment theory, and for assessing damages for mental anguish (and punitive damages, if plaintiff had been employed by a private instead of a public university). But, the language of the 1991 amendment (42 U.S.C. § 1981a) only expressly guarantees trial by jury of claims of **compensatory** damages, as distinguished from relief which Michael could have obtained under Title VII before the 1991 amendment, such as wages lost as a proximate consequence of UAB's alleged Title VII misconduct. It made no sense whatsoever to try to a jury the question of this particular employer's motivation for the purpose of determining pursuant to Title VII the amount of its employee's mental anguish, if any, and conducting a bench trial on the same question for the purpose of the court's separately determining the amount of the back pay and other benefits, if any, traceable to the same conduct. By excluding from the reach of § 1981a all Title VII cases which could have been brought under 42 U.S.C. § 1981, Congress carefully preserved the previously existing right of the victims of **racial** discrimination in the workplace to seek uncapped

compensatory (including "back pay") damages, and punitive damages, and the right to trial by jury. Did Congress mean belatedly to acknowledge the demands of the Seventh Amendment for non-racial forms of employer proscribed mistreatment of employees, such as gender discrimination, but to keep the back pay issue away from the jury? In 1964, Title VII made no mention whatsoever of jury trial. Did Congress in 1991 mean to deny a jury trial it had never before denied? This court believes that in 1991 Congress waked up sleepily to the demands of the Seventh Amendment. This court heeded the Seventh Amendment's call long before 1991. The Eleventh Circuit earlier rejected that call, and the Supreme Court has entirely and studiously avoided the whole issue. *See Beesley v. Hartford Fire and Insurance Co.*, 717 F.Supp. 781, 723 F.Supp. 635 (N.D. Ala. 1989); *Walton v. Cowin Equipment Co., Inc.*, 733 F.Supp. 327 (N.D. Ala. 1990); *Walker v. Anderson Elec. Connectors*, 736 F.Supp. 253, (N.D. Ala. 1990). Believing that Seventh Amendment jurisprudence, largely as a by-product of the 1991 amendment, has now moved beyond the Eleventh Circuit's earlier rejection of jury trial in Title VII cases, this court in this case found Michael's back pay claim to be "triable to a jury," just like her claim for mental anguish, and, therefore, heeded her demand for a jury trial of her back pay claim. Therefore, the jury in this case was empaneled to try both the so-called "back pay" issue and the so-called "compensatory damages" issue. There was no mention in the pretrial order or in open court of this jury's being constituted

only as an advisory jury on the back pay issue. To submit to a jury the question of compensatory damages while seeking only its "advice" on back pay not only violates the Seventh Amendment in spirit and in practical effect, but, as a practical matter, it is impossible. Although the Congressional intent with respect to jury trials on "back pay" perhaps could have been better expressed in § 1981a, and certainly could have been more categorically stated, Congress came to a belated acknowledgment of the venerable and salutary public policy represented by the Seventh Amendment. It is now time to proceed with juries to quantify back pay in Title VII cases, just as juries in FELA cases have been doing since FELA was enacted. In fact, in FELA, and in other tort cases, juries routinely fix even lost **future** income, otherwise strangely called "front pay." There is no longer any logical reason for distinguishing between Title VII and FELA in this regard. Both are peculiarly federally-created causes of action. If there was ever a reason for not letting a jury try back pay issues, that reason disappeared when juries began routinely trying the issues of compensatory and punitive damages under § 1981a.

### The 1992-1993 Salary Decision

The jury in this case found that Michael was twice the victim of disparate treatment, first in UAB's decision respecting Michael's salary increase in 1992 and, second, in UAB's non-renewal decision in 1995. The jury separately fixed the amounts of back pay it found to have been proximately caused by these two

decisions. The first is found in the jury's response to interrogatory No. 3, in which it found a loss of $1,114.72 in back pay resulting from UAB's division among its three simultaneously employed anthropology professors of the departmental money available for salary increases for the academic year 1992-1993. That decision was made years before Michael filed her EEOC complaint. The reasoning that led to that decision was only discovered during the preparation for Michael's administrative hearing before the UAB tribunal that was constituted to hear her appeal of the non-renewal of her contract for 1996 and to consider her claim of gender harassment. During the investigation of the non-renewal decision, Michael obtained a copy of the private memo kept by the head of the anthropology department, Dr. Nance, who, accordingly to his memo, changed his mind during his thinking process and recommended less of an increase to Michael than he had initially written down in his memo to himself. For aught appearing, Dr. Nance never before shared with anybody his memo or tentative salary thoughts on the 1992-1993 salary distribution. When the jury answered "yes" to question No. 1, it was necessarily concluding that Dr. Nance was motivated, in part, by Michael's gender when he sliced or mis-sliced the anthropology salary pie for the academic year 1992-1993. The court can find no authority under such circumstances for a tolling of the 180 day limitation for filing an EEOC complaint after the adverse employment decision. In this instance, the adverse decision, if there was one, was the

5

establishment of Michael's salary increase for 1992-1993 in relation to the male professorial salary increases. Michael certainly knew the amount of her previous salary, and the amount of its increase. She did not complain about it at the time. Dr. Nance's private arithmetic, serendipitously uncovered by Michael, and contemporaneously by persons in authority at UAB other than Dr. Nance himself, several years after the salary decision was made, cannot, in this court's opinion, belatedly have created a Title VII cause of action, so as suddenly to start the 180 days for complaining to the EEOC. On such a theory of tolling, Michael could have first discovered Dr. Nance's piece of paper during the recent trial itself and, thereupon asked leave of the court to amend her complaint to claim a gender-biased salary increase decision in 1992. Conspicuously, Michael did not testify that she was unaware of the salary increases given to her two male comparators for the academic year 1992-1993. For aught appearing, she knew the amounts of all salary increases. The only thing she lacked was Dr. Nance's private and unofficial piece of paper, an item that he could have dropped in the wastebasket, but didn't.

In her EEOC complaint, Michael charged, *inter alia*, that "Nance **reduced my pay raise...**". (emphasis supplied). This sounds like Michael had actually received a raise and that it thereafter was reduced. The EEOC charge conspicuously did not give a date for the alleged raise reduction. The EEOC complaint did provide the date of the more recent and clearly non-barred non-renewal

6

decision. What would the EEOC have done with a complaint of an adverse action taken years before the filing? This court suspects that if the Eleventh Circuit were among those circuits that do not allow the issuance of a right-to-sue by the EEOC until 180 days have elapsed from the date of the EEOC complaint, that the EEOC here would have found Michael's pay raise claim time barred and/or lacking in merit. But, to speculate about what the EEOC would have done is no more helpful in deciding this case than what the EEOC does in cases in which it makes a determination.

Both because there was no substantial evidence in this case upon which a tolling mechanism can fairly be based, and because there was no substantial evidence upon which to base a finding that the salary division for 1992-1993 was motivated by Michael's gender, this court will grant UAB's Rule 50(a) motion with respect to Michael's claim of alleged disparate treatment in UAB's 1992-1993 salary distribution decision.

Moreover, to try to figure what Michael would have received by way of a pay raise in 1992-1993, but for her gender, involves so much speculation that it defies determination. If, as a hangover from pre-1991 Title VII jurisprudence, Michael was not entitled to a jury trial of her back pay claims, this court, entirely independent of what this jury did, would find that Michael failed to meet her burden of proving the essential elements of a claim of back pay lost as a result of what she hopefully describes as a failure to raise her salary appropriately in 1992-1993.

7

### Lost Back Pay From the Non-Renewal

In the jury's answers to interrogatories Nos. 4 and 6, the jury found that Michael was the victim of gender-based unequal treatment when her contract was not renewed in 1995 for the next academic year and that as a consequence she lost income in the amount of $123,958.72. In UAB's decision not to renew Michael's contract it was following Dr. Nance's recommendation. The jury found Dr. Nance's recommendation to have been motivated to an impermissible degree by Michael's being a woman. There certainly was evidence upon which a reasonable jury could have reached a different conclusion from the conclusion it reached, but there was also evidence to support the conclusion that it did reach, that is, assuming that all it takes to make out a circumstantial case of gender motivated termination is to prove (1) that plaintiff is a woman, (2) that the decision maker was a man, (3) that the decision-maker was rude to plaintiff, but not in a sexually suggestive way and not as part of a pervasive pattern of conduct in relation to other females. If this court had been the fact-finder, it may not have reached the conclusion this jury reached, but this court was not the fact-finder.

The fact that Michael has never been replaced since her departure presents another problem. The classic way to make out a case of actionable disparate treatment in a wrongful termination case requires proof, *inter alia*, that the terminated woman was replaced by a man. The evidence in this case, construed most

8

favorably to Michael, was simply that she was not renewed after having been on a six-year tenure track for four years. A tenure track provides no guaranty of renewal or of tenure even after the completion of the anticipated six consecutive annual teaching contracts. There was no evidentiary basis for this jury to find that "but for" Michael's gender she would **still be** a professor at UAB. What UAB's decision-makers would have decided with respect to Michael's employment for the year following her actual departure, and before she would either have been granted tenure or would have had to depart, is conjectural, but the evidence was undisputed that within a year after Michael's non-renewal, the anthropology department ran out of money and has never hired a professor to replace Michael. The back pay calculation put forward by Michael assumes that "but for" her gender she would **still be** employed by UAB. This is a difficult, if not impossible, assumption to justify on this evidence. Although UAB's legitimate, articulated reason for Michael's non-renewal was not a reduction-in-force, the evidence is that a reduction-in-force, or a major restructuring or downward adjustment of salaries, would have become necessary within a year after Michael was non-renewed. Dr. Nance was not responsible for creating a lack of funds. As a part of Michael's case did she have an obligation to offer proof of what would have happened in future years if her gender had not poisoned the one non-renewal decision she complains of, or, did UAB, as part of its so-called *Mt. Healthy* defense, have to overcome some sort of

9

presumption that Michael would have remained a UAB professor until the date of trial "but for" UAB's unlawful decision in 1995? This is an interesting and a difficult question. As unfair as it seems to the court to require UAB to pay for work Michael never performed, and, perhaps never would have been entitled to perform except for one year, the court will deny UAB's Rule 50(a) motion insofar as it challenges Michael's claim of a violation of Title VII for her non-renewal. As a questionable consequence, the court will enter judgment on the jury's back pay award contained in answer to interrogatory No. 6.

### Mental Anguish Reduction

The jury's award of $600,000 in compensatory damages in answer to interrogatory No. 7, must be reduced to $300,000 because of 42 U.S.C. § 1981a(b)(3)(D). UAB concedes that it has more than 500 employees. Any error committed by the court in allowing the jury to include within "compensatory damages" out-of-pocket expenses allegedly occurred by Michael is obviated by the statutorily mandated cap. There was gracious plenty of evidence of Michael's mental anguish or emotional distress to justify the reduced award of $300,000. *See Koster v. Trans World Airlines, Inc.*, ___ F.3d ___,1999 WL 396023 (1st Cir. 1999).

### The Prayer for Reinstatement

Michael demanded reinstatement in her original complaint, and has filed a post-verdict motion seeking reinstatement. Specifically, Michael now "respectfully requests this Honorable

Court to reinstate the plaintiff to her previously-held position as assistant professor of Anthropology at UAB." This request presents an extremely difficult problem to deal with in an academic setting. The court could not give it to the jury. If Michael had been renewed for the 1992-1993 academic year, there is no evidence upon which this court could reasonably conclude that she would have been renewed again and again, and ultimately granted tenure. The mere fact, found by the jury, that the non-renewal decision in 1995 was influenced to some degree by Michael's gender, does not mean that such a proscribed motivation would have continued and caused her non-renewal the next year and would ultimately have been an obstacle to the granting of tenure. Tenure is not the automatic result of five or six annual contract renewals. It is an expectation that may or may not turn into reality. There are many imponderables along the way. This court is uncomfortable when called upon to substitute its judgment for the judgment of Michael's academic peers in a matter as sensitive and important as the granting of tenure. Although Michael's current motion does not ask this court to grant her tenure, and instead only asks for reinstatement to her previously-held position, the real effect of such a reinstatement is unknowable and contains the seeds of further controversy. If reinstatement were ordered, until some subsequent decision respecting Michael were made by UAB, all Michael would have is a one-year contract awarded more than six years after her initial six year expectation has expired. With

11

Michael not having been replaced because of fiscal restraints, to order her reinstatement at this time would, in effect, place this court in the position of having ordered an increase in the size and budget of UAB's department of anthropology, something any court should be reluctant to do.  This court does not want to undertake the running of UAB or to monitor everything UAB does in the future vis-a-vis Michael.  If there were evidence upon which this court could find that UAB has been holding open Michael's assistant professorship pending the outcome of this case, so that UAB's only reason for not having appointed a replacement professor is to see what this court does, the solution to the reinstatement problem would be easy, but to order UAB to employ Michael when its departmental budget cannot afford it  stretches the reach of Title VII beyond the breaking point.  This is one of those "extraordinary cases" in which the usual rule of reinstatement should not be automatically applied.

    Instead of ordering Michael's full reinstatement, this court, in an exercise of its discretion and of its equity powers, will require UAB to hire Michael for one year as an assistant professor of anthropology only if and when, within the next five years, UAB decides to add an assistant professor in that department. Michael's salary in that event shall be no less than the salary of the then next to lowest paid assistant professor of anthropology. If Michael is employed again by UAB, UAB's decisions with respect to Michael after one year from her re-employment will not be

12

monitored by this court.

Conclusion

A separate appropriate judgment will be entered.

DONE this __12th__ day of August, 1999.

                          /s/ William M. Acker
                          WILLIAM M. ACKER, JR.
                          UNITED STATES DISTRICT JUDGE